

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00127-CV

_____

SHAWN CIMIANO AND NANCY CIMIANO, Appellants

V.

MICHAEL HALBERSTAM AND CHAYA HALBERSTAM, Appellees

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-336220-22

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

Texas residents Shawn and Nancy Cimiano sued New Jersey residents Michael and Chaya Halberstam in a Texas state court for fraudulent transfer. The Halberstams filed a special appearance challenging Texas's personal jurisdiction over them. This appeal arises from the trial court's granting that special appearance.

In four issues, the Cimianos argue that the trial court erred by granting the Halberstams' special appearance because (1) the trial court abused its discretion by denying the Cimianos a continuance to conduct jurisdictional discovery; (2) the Halberstams untimely supplemented their special appearance; (3) the Halberstams failed to negate all bases for personal jurisdiction alleged by the Cimianos; and (4) the criminal-conduct allegations against Michael in the Cimianos' pleadings are a basis for personal jurisdiction over him. Because (1) the trial court did not abuse its discretion by denying the Cimianos a continuance, (2) the Halberstams' special-appearance supplement was not untimely, and (3) the Halberstams lack the requisite minimum contacts with Texas to be subject to personal jurisdiction here, we will affirm the trial court's order.

## I. Background

In August 2018, the Cimianos sued their former landlord, Ozrow Fort Worth Holdings, LLC, in Tarrant County Court at Law Number 2 for violations of the Texas Deceptive Trade Practices Act and Chapter 92 of the Texas Property Code. At that time, Ozrow was a Texas limited-liability company with its principal office and place

of business in New Jersey. The Halberstams—who are New Jersey residents—were Ozrow's members.

According to the Cimianos' allegations here, in September 2018—before they served Ozrow with citation—Ozrow sold or conveyed Amberwood Apartments, its only known real property. In October 2018, the Cimianos served Ozrow, but Ozrow never answered or otherwise appeared in the lawsuit. As a result, in December 2018, the county court granted the Cimianos a no-answer default judgment against Ozrow and awarded them about $105,000 in damages and attorney's fees.

A notice of judgment was mailed to Ozrow at its office in New Jersey. The Cimianos unsuccessfully attempted to conduct postjudgment discovery; Ozrow never paid the judgment.

In July 2019, Michael signed a "Certificate of Termination of a Domestic Entity" on Ozrow's behalf and filed it with the Texas Secretary of State. According to the certificate, Ozrow had voluntarily decided to wind up and had "complied with the provisions of the Texas Business Organizations Code governing its winding up." Ozrow never notified the Cimianos of its winding up.

In September 2022, the Cimianos attempted to collect on the judgment by suing the Halberstams—in their individual capacities in Tarrant County District Court—for fraudulent transfer, claiming that any funds that Ozrow had transferred to the Halberstams as a result of or in connection with Amberwood Apartments' sale or Ozrow's winding up were transferred with the intent to delay, hinder, and defraud the

3

Cimianos from collecting the judgment. The Cimianos further alleged that the Halberstams were jointly and severally liable for Ozrow's conduct because Ozrow was the Halberstams' alter ego.

Relevant here, the Cimianos pleaded that Texas has personal jurisdiction over the Halberstams because "they do business in this state and/or have purposefully availed themselves of the forum as described in this petition." The Halberstams specially appeared, challenging the trial court's general and specific personal jurisdiction over them.

The Cimianos moved to continue the special-appearance hearing to allow them time for jurisdictional discovery. They also amended their petition by replacing their previous personal-jurisdiction allegations with the following:

> [The Cimianos] aver that this Court has personal jurisdiction over [the Halberstams] because Ozrow . . . was [the Halberstams'] alter ego and the corporate fiction should be disregarded. Ozrow . . . clearly purposefully availed itself of the forum—it was a Texas limited liability company and actively conducted business in this state. Moreover, [the Halberstams] engaged in fraudulent conduct, including criminal conduct in the case of Michael Halberstam, that [the Cimianos] intend to show resulted in [their] purposefully establishing minimum contacts with Texas such that they could reasonably have anticipated being haled into court in Texas. Based on a long history of having interests in entities doing business in Texas, it also seems reasonably likely that there may be some basis for general jurisdiction based on systematic and continuous contacts that could be shown after discovery.

The Cimianos also pleaded additional allegations in support of their alter-ego theory: that Michael had signed and filed a materially false certificate of termination for Ozrow with the Texas Secretary of State. Specifically, he had "indicated that

4

Ozrow . . . had 'complied with the provisions of the Texas Business Organizations Code governing its winding up' when it had not done so, namely by not notifying [the Cimianos] of the wind-up."

Two days before the special-appearance hearing, the Halberstams supplemented their special appearance to respond to the Cimianos' amended pleading.

The trial court heard the continuance motion and the special appearance together. It orally denied the former at the hearing. Later that day, the trial court signed an order granting the special appearance and dismissing the Cimianos' claims against the Halberstams with prejudice. The Cimianos timely appealed.

## II. The Cimianos' Continuance Motion

In their first issue, the Cimianos contend that the trial court abused its discretion by denying them a continuance to conduct jurisdictional discovery because the Texas Rules of Civil Procedure prohibited them from conducting discovery before the Halberstams filed their answer[1] and because the 18 days between the Halberstams'

---

[1] "[U]nless otherwise agreed to by the parties or ordered by the court, a party cannot serve discovery on another party until after the other party's initial disclosures are due." Tex. R. Civ. P. 192.2(a)(1). Initial disclosures must be made "within 30 days after the filing of the first answer or general appearance unless a different time is set by the parties' agreement or court order." Tex. R. Civ. P. 194.2(a). The Halberstams did not answer or generally appear, presumably to not waive their special appearance. *See* Tex. R. Civ. P. 120a(1); *Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 305 (Tex. 2004) (discussing the due-order-of-pleading rule); *McCoy v. Platinum Power Moves, Inc.*, No. 01-17-00653-CV, 2018 WL 3581021, at *3 (Tex. App.—Houston [1st Dist.] July 26,

filing their special appearance and the special-appearance hearing left the Cimianos with no opportunity to conduct jurisdictional discovery.

Texas Rule of Civil Procedure 120a(3) governs jurisdictional discovery. *See* Tex. R. Civ. P. 120a(3). The rule provides that "[t]he court shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." *Id.* Rule 120a(3) further provides that

> [s]hould it appear from the affidavits of a party opposing the [special appearance] that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

*Id.* In short, "Rule 120a(3) gives the trial court the discretion to continue a special appearance hearing and thereby extend the time in which evidence may be served, but this power applies only to a party opposing the special appearance who avers that he cannot adequately prepare for the special appearance hearing." *Said v. Maria Invs., Inc.*, No. 01-08-00962-CV, 2010 WL 457463, at *3 (Tex. App.—Houston [1st Dist.] Feb. 11, 2010, pet. denied) (mem. op. on reh'g).

We review a trial court's denying a continuance of a special-appearance hearing to obtain discovery authorized by Texas Rule of Civil Procedure 120a for an abuse of

---

2018, no pet.) (mem. op.) ("[W]hen a nonresident defendant makes a general appearance in a suit by filing his original answer before his sworn special appearance, the defendant waives his special appearance.").

6

discretion. *See In re Christianson Air Conditioning & Plumbing, LLC*, 639 S.W.3d 671, 676 (Tex. 2022) (orig. proceeding) (citing *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002)); *Barron v. Vanier*, 190 S.W.3d 841, 847 (Tex. App.—Fort Worth 2006, no pet.) (op. on reh'g). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

Here, the Halberstams argued in their special appearance that the Cimianos had failed to plead sufficient jurisdictional facts to bring them within the reach of Texas's long-arm statute. The Halberstams further argued that even if the Cimianos' long-arm pleadings were sufficient, the Halberstams had insufficient contacts with Texas to subject them to personal jurisdiction here, and the Cimianos had failed to sufficiently allege or prove an alter-ego theory conferring personal jurisdiction over the Halberstams.

In their affidavits supporting their special appearance, the Halberstams averred that they were New Jersey residents, they were domiciled there, and they had never been Texas residents. Michael stated that he had been a member of Ozrow until it was voluntarily dissolved; that "Ozrow voluntarily decided to wind up its business in a manner approved by the Texas Business Organizations Code and by the governing documents for Ozrow"; and that he had "filed or caused to be filed" Ozrow's termination certificate with the Texas Secretary of State in July 2019. He further

7

averred, "From the time Ozrow purchased the Amberwood Apartments in 2014 through the time Ozrow legally wound up its business in 2019, I never once travelled to Texas or otherwise physically entered Texas." Chaya stated in her affidavit that she had never travelled to Texas. Both Michael and Chaya further stated that in their individual capacities, they had never done business in Texas, had never been employed in Texas, had never contracted with a Texas resident or business, and had never recruited employees in Texas for employment in Texas or elsewhere.

The Cimianos moved to continue the special-appearance hearing to allow them the opportunity to depose the Halberstams and to serve written discovery on them. The Cimianos supported their verified continuance motion with nearly identical unsworn declarations[2] stating that

- They did not know whether the Halberstams had "ever been to Texas or of the extent of their connections to Texas beyond having interests in various entities doing business in Texas and taking various actions in connection with such entities";

- The Cimianos knew "from a review of public records" that the Halberstams were members of Ozrow and that Michael wound up Ozrow on July 3, 2019;

- The Cimianos received no notice that Ozrow "was being wound up prior to the wind-up";

---

[2]Aside from exceptions inapplicable here, "an unsworn declaration may be used in lieu of a written sworn declaration, verification, certification, oath, or affidavit required by statute or required by a rule, order, or requirement adopted as provided by law." Tex. Civ. Prac. & Rem. Code Ann. § 132.001(a).

8

- They had been awarded a judgment against Ozrow in county court of law in December 2018;

- They knew "from a review of property records, that the Amberwood Apartments property was sold on or about September 6, 2018, after [they had] filed the previous lawsuit against Ozrow";

- "A notice of judgment . . . was presumably mailed by the County Clerk's office" to Ozrow at the New Jersey address stated in a certificate of last known address that had been filed with the Tarrant County Clerk before the December 2018 judgment was signed;

- Before Ozrow's winding up, the Cimianos' attorney sent a motion and various post-judgment discovery requests to Ozrow at its last-known address, but Ozrow did not respond to the discovery;

- The Cimianos made "unsuccessful attempts to conduct the post-judgment deposition of Michael Halberstam"; and

- The judgment against Ozrow remains unpaid.

On appeal, the Cimianos primarily rely on *Barron v. Vanier*, a case in which we held that the trial court abused its discretion by denying plaintiff Barron's motion for a continuance to conduct jurisdictional discovery. 190 S.W.3d at 853. In that case, we addressed the sufficiency of Barron's affidavits in response to nonresident defendants Goldowitz and Vanier's arguments that the affidavits were conclusory and were insufficient under Rule 120a(3) because "they did not provide 'reasons' why [Barron] could not obtain an affidavit with essential facts to justify his opposition in accordance with 120a(3), but merely stated that 'he has not secured' the facts." *Id.* at 851–52. The affidavits in *Barron* stated as follows:

> Since this matter was remanded to the present Court, [Goldowitz/Vanier] has filed a special appearance. [Barron] has not

secured all the facts essential to justify his opposition pursuant to TRCP 120a(3). [Barron] has diligently been responding to numerous motions by [Goldowitz/Vanier] in the federal action and due to the recent remand has been unable to secure discovery from [Goldowitz/Vanier]. [Barron] therefore requests that this Court grant a continuance . . . .

Specifically, [Barron] needs to obtain discovery from [Goldowitz/Vanier] regarding his contacts with the State of Texas, his business dealings in Texas and his direction of torts at Texas residents. [Barron] believes [he] would be able to obtain this information with discovery. This information is material to the special appearance as it shall provide proof that [Goldowitz/Vanier] has . . . availed himself to the jurisdiction of this Court.

*Id.* at 851 (alterations in original).

We rejected the argument that the affidavits did not comply with Rule 120(3) because "the reasons stated in the affidavits cause 'it [to] appear . . . that Barron cannot . . . present by affidavit' the facts . . . needed to justify his opposition to the special appearance." *Id.* at 852 (alteration in original). We further concluded that Barron had provided "in his affidavit[s] at least one of the reasons why he had been unable to secure facts essential to justify his opposition: because the case was only recently remanded." *Id.*

Here, the Cimianos' affidavits fall short of those in *Barron*. In their affidavits, the Cimianos failed to mention, discuss, or explain what jurisdictional discovery they were seeking, much less state any reason why they could not "present by affidavit facts essential to justify [their] opposition" to the Halberstams' special appearance. Tex. R. Civ. P. 120a(3). The Cimianos merely stated that they do not know whether the Halberstams had "ever been to Texas" or "the extent of their connections to

10

Texas beyond having interests in various entities doing business in Texas and taking various actions in connection with such entities." But the Halberstams addressed these issues in their affidavits: Chaya has never been to Texas; Michael had not been to Texas between Ozrow's purchasing Amberwood Apartments in 2014 and Ozrow's winding up in 2019; and neither Halberstam had, in their individual capacity, done business in Texas, been employed in Texas, contracted with a Texas resident or business, or recruited employees in Texas for employment in Texas or elsewhere. The Cimianos did not explain how a continuance of the special-appearance hearing to conduct discovery about whether the Halberstams had ever been to Texas or the extent of their Texas connections aside from their business contacts was necessary in light of the statements in the Halberstams' affidavits. *See Windsor v. Round*, 591 S.W.3d 654, 669–70 (Tex. App.—Waco 2019, pet. denied) (citing *In re Stern*, 321 S.W.3d 828, 840 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding) (op. on reh'g)) (stating that Rule 120a(3) "does not authorize postponement of a special appearance hearing to allow a party to obtain discovery before the trial court's ruling on the special appearance that is unnecessary or irrelevant to the establishment of jurisdictional facts" and concluding that a continuance was unnecessary because nonresident defendant filed an affidavit addressing jurisdictional discovery plaintiff was seeking). We thus conclude that the trial court did not abuse its discretion by denying the Cimianos' continuance motion. We overrule the Cimianos' first issue.

### III. The Halberstams' Special-Appearance Supplement

The Cimianos argue in their second issue that the Halberstams' supplemental special appearance—filed two days before the special-appearance hearing—was untimely under Texas Rule of Civil Procedure 21, which requires that

> [a]n application to the court for an order and notice of any court proceeding, as defined in Rule 21d(a), not presented during a court proceeding, must be served upon all other parties not less than three days before the time specified for the court proceeding, unless otherwise provided by these rules or shortened by the court.

Tex. R. Civ. P. 21(b). The Cimianos assert that a supplement to a special appearance "clearly qualifies" as "an application to the court for an order" and thus must be filed at least three days before the hearing. *See In re Keck*, 329 S.W.3d 658, 661–62 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (reversing and remanding protective order for lack of notice under Rule 21 because father did not have proper notice of hearing on mother's motion to reconsider prior ruling granting protective order because father had not been served with mother's reconsideration motion and was not notified that court was going to consider that motion or additional evidence until the hearing, which was set for the purpose of entering a final protective order based on trial court's prior ruling).

The Halberstams counter that the Cimianos failed to preserve this complaint for our review because they did not raise it in the trial court. *See* Tex. R. App. P. 33.1(a)(1)(A) (stating that to preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific

12

grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context.). But contrary to the Halberstams' assertion, the Cimianos did raise their untimeliness complaint in the trial court and asked the trial court to strike and not consider the Halberstams' supplement because it was untimely under Rule 21(b). The Cimianos did not, however, secure a ruling from the trial court or object to the trial court's refusing to rule. To preserve a complaint for our review, the objecting party must also get a ruling—either express or implied—from the trial court. Tex. R. App. P. 33.1(a)(2)(A), (b); *see Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002). If the trial court refuses to rule, the party preserves error by objecting to that refusal. Tex. R. App. P. 33.1(a)(2)(B). If the trial court does not rule and the party does not object to the refusal to rule, error is not preserved. *Id.* The Cimianos thus failed to preserve this complaint for our review.

But even if the Cimianos had preserved this complaint, we would overrule it. The Halberstams' special-appearance supplement was not a new or different "application to the court for an order." Tex. R. Civ. P. 21(b). The Halberstams merely supplemented the legal arguments made in their special-appearance with additional argument and caselaw about whether the Cimianos could establish personal jurisdiction over the Halberstams through an alter-ego theory as more specifically pleaded in the Cimianos' amended petition, which was filed a week before the special-appearance hearing. *See Hailey v. Glaser*, No. 06-12-00065-CV, 2012 WL 5872869, at *1 n.6 (Tex. App.—Texarkana Nov. 21, 2012, no pet.) (mem. op.) (noting that special-

appearance supplement allowed by trial court "did not add any additional legal arguments but merely supplemented prior arguments with additional caselaw"). We thus conclude that the trial court did not abuse its discretion by not striking the Halberstams' special-appearance supplement. We overrule the Cimianos' second issue.

## IV. Personal Jurisdiction

In their third and fourth issues, the Cimianos argue that the trial court erred by granting the Halberstams' special appearance because the Halberstams failed to negate all bases for personal jurisdiction pleaded by the Cimianos and because Michael's allegedly engaging in criminal conduct in Texas is a basis for personal jurisdiction over him. The Cimianos argue that the Halberstams were Ozrow's alter ego for jurisdictional purposes and that the Halberstams' individual Texas contacts gave rise to both specific and general jurisdiction.

After we set out the standard of review, the applicable law, and the parties' shifting burdens of proof, we will address each of the Cimianos' alleged bases for personal jurisdiction—alter ego, specific jurisdiction, and general jurisdiction—in turn.

### A. Standard of review and applicable law

Because a trial court's authority to exercise personal jurisdiction over a nonresident defendant is a legal question, we review de novo a trial court's decision to grant or deny a special appearance. *See State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 413 (Tex. 2023); *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–

06 (Tex. 2002). When, as here, the trial court did not file findings of fact and conclusions of law, we infer all facts that are necessary to support the judgment and are supported by the evidence. *See BMC Software*, 83 S.W.3d at 795. When the record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Id.*

A Texas court may exercise personal jurisdiction over a nonresident if "(1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *see also* Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045. The Texas long-arm statute allows Texas courts to exercise personal jurisdiction over a nonresident defendant who "does business" in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042; *BMC Software*, 83 S.W.3d at 795. The statute lists three activities that constitute "doing business" in Texas: (1) contracting with a Texas resident when either party is to perform the contract in whole or in part in Texas; (2) committing a tort in whole or in part in Texas; and (3) recruiting Texas residents for employment inside or outside of Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042. But this list is not exclusive, and the statute's "broad language extends Texas courts' personal jurisdiction 'as far as the federal constitutional requirements of due process will permit.'" *BMC Software*, 83 S.W.3d at 795 (quoting *U-Anchor Advert., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)).

15

Because the long-arm statute reaches "as far as the federal constitutional requirements for due process will allow," a Texas court may exercise personal jurisdiction over a nonresident so long as doing so "comports with federal due[-]process limitations." *TV Azteca* v. *Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016) (quoting *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010)). In determining whether federal due-process requirements have been met, we rely on precedent from the United States Supreme Court and other federal courts, as well as Texas state-court decisions. *BMC Software*, 83 S.W.3d at 795; *TravelJungle v. Am. Airlines, Inc.*, 212 S.W.3d 841, 845–46 (Tex. App.—Fort Worth 2006, no pet.). Federal due process is satisfied when (1) the defendant has established minimum contacts with the state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413, 137 S. Ct. 1549, 1558 (2017); *TV Azteca*, 490 S.W.3d at 36.

A defendant establishes minimum contacts with a state when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958)). Three principles govern our purposeful-availment analysis: (1) only the defendant's contacts with Texas are relevant, not the unilateral activity of another party or third person; (2) the defendant's acts must be purposeful and not random, isolated, or fortuitous; and (3) the defendant must seek some benefit,

16

advantage, or profit by availing itself of Texas's jurisdiction so that it impliedly consents to suit here. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 886 (Tex. 2017) (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)).

To constitute purposeful availment, the defendant's contacts must be "purposefully directed" to Texas. *TV Azteca*, 490 S.W.3d at 38 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991)). Those contacts also must result from the defendant's own "efforts to avail itself of the forum." *Id.* (quoting *Moki Mac*, 221 S.W.3d at 576). A defendant will not be haled into Texas based solely on contacts that are "random, isolated, or fortuitus," *id.* (quoting *Michiana*, 168 S.W.3d at 785), or on the "unilateral activity of another party or a third person," *id.* (quoting *Guardian Royal*, 815 S.W.2d at 226). "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Retamco*, 278 S.W.3d at 338 (quoting *Am. Type Culture Collection*, 83 S.W.3d at 806).

A defendant's contacts can give rise to general or specific jurisdiction. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013). General jurisdiction "arises when a defendant's contacts with the forum state are so 'continuous and systematic' that the defendant is 'essentially at home.'" *Volkswagen*, 669 S.W.3d at 412 (quoting *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021)).

General jurisdiction "allows courts to render a binding judgment against a defendant even if the plaintiff's claims neither arise from activities conducted in the forum state nor 'relate to the forum [s]tate or the defendant's activity there.'" *Id.* (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358, 141 S. Ct. 1017, 1024 (2021)). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . ." *Daimler AG v. Bauman*, 571 U.S. 117, 137, 134 S. Ct. 746, 760 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924, 131 S. Ct. 2846, 2853 (2011)).

By contrast, specific jurisdiction exists when the cause of action arises from or is related to a defendant's purposeful activities in the state. *Moncrief Oil*, 414 S.W.3d at 150. "For a Texas court to exercise specific jurisdiction over a defendant, '(1) the defendant's contact with Texas must be purposeful, and (2) the cause of action must arise from those contacts.'" *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 559 (Tex. 2018) (quoting *Michiana*, 168 S.W.3d at 795). When analyzing specific jurisdiction, our focus is thus on the relationship among Texas, the defendant, and the litigation. *Moncrief Oil*, 414 S.W.3d at 150.

## B. The parties' shifting burdens of proof

The plaintiff and the defendant bear shifting burdens of proof in a challenge to personal jurisdiction. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff must first plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute. *Id.* "To determine whether the plaintiff

18

satisfied its pleading burden and to determine the basis for jurisdiction alleged by the plaintiff, a court considers the allegations in the plaintiff's petition as well as those in its response to the defendant's special appearance." *Graves v. DJO, LLC*, 636 S.W.3d 321, 325 (Tex. App.—Fort Worth 2021, pet. denied) (op. on reh'g) (citing *Am. Refrigeration Co. v. Tranter, Inc.*, No. 02-15-00265-CV, 2016 WL 5957018, at *3 (Tex. App.—Fort Worth Oct. 13, 2016, no pet.) (mem. op.)).

Once the plaintiff has met this burden, the burden shifts to the defendant to negate all alleged bases of personal jurisdiction.[3] *Id.* A defendant can negate jurisdiction on either a legal or factual basis:

> Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Kelly*, 301 S.W.3d at 659 (footnotes omitted).

---

[3]As we explain below, an exception to this rule arises when the plaintiff asserts an alter-ego theory as the basis for personal jurisdiction—the plaintiff must prove that the nonresident defendant is the alter ego of the corporate entity. *E.g.*, *SNP Schneider-Neureither & Partner AG v. Wood*, No. 05-18-00576-CV, 2019 WL 2521723, at *3 n.4 (Tex. App.—Dallas June 19, 2019, no pet.) (mem. op.); *Nichols v. Tseng Hsiang Lin*, 282 S.W.3d 743, 749–50 (Tex. App.—Dallas 2009, no pet.).

Here, we will assume without deciding that the Cimianos pleaded sufficient allegations to bring the Halberstams within the reach of the Texas long-arm statute.

## C. Alter ego

The Cimianos pleaded that the trial court had personal jurisdiction over the Halberstams because Ozrow—a Texas limited liability company that "actively conducted business in [Texas]"—was the Halberstams' alter ego. In support of their alter-ego theory, the Cimianos alleged that the Halberstams had used Ozrow's corporate form to perpetrate a fraud against them because the Halberstams had wound up Ozrow without paying the judgment and without notice to the Cimianos, who were Ozrow's creditors. The Cimianos further alleged that as part of this purported scheme, Michael, as a member of Ozrow, signed a "materially false certificate of termination," transmitted it to Texas, and filed it with the Texas Secretary of State, thus subjecting him to criminal liability under the Texas Business Organizations Code. *See generally* Tex. Bus. Orgs. Code Ann. §§ 4.008, 11.052–.053. The Cimianos speculated that the Halberstams had "extensive dominion and control over Ozrow . . . when they sold off property, kept the company open potentially without any substantial assets, and then [later] wound the company up 'under the radar' without providing notice to [the Cimianos]—likely for [the Halberstams'] personal benefit."

Texas law presumes that the Halberstams and Ozrow were separate legal persons. *See Zhao v. iComposite, LLC*, No. 14-20-00605-CV, 2022 WL 176077, at

*3 (Tex. App.—Houston [14th Dist.] Jan. 20, 2022, no pet.) (mem. op.) (citing *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007)). The Cimianos had the burden of proving that a Texas court should treat the Halberstams and Ozrow as alter egos for personal-jurisdiction purposes. *See id.* (citing *PHC-Minden*, 235 S.W.3d at 173); *see also Helmer v. Rusco Operating, LLC*, No. 03-21-00148-CV, 2022 WL 963236, at *3 (Tex. App.—Austin Mar. 31, 2022, no pet.) (mem. op.) ("[W]hen the plaintiff relies on the existence of an alter[-]ego relationship to impute a corporation's contacts with Texas to an individual, the plaintiff must present evidence demonstrating that such a relationship exists."); *cf. BMC Software*, 83 S.W.3d at 798 ("The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove the allegation."). "While ordinarily a nonresident defendant has the burden to negate all bases for personal jurisdiction properly pleaded, a plaintiff who relies on the existence of an alter-ego relationship to impute a corporation's contacts with Texas to an individual must prove that such a relationship exists." *Atiq v. CoTechno Grp., Inc.*, No. 03-13-00762-CV, 2015 WL 6871219, at *8 (Tex. App.—Austin Nov. 4, 2015, pet. denied) (mem. op. on reh'g).

A Texas court could exercise personal jurisdiction over the Halberstams under an alter-ego theory if the relationship between them and Ozrow would allow the trial court to impute Ozrow's Texas contacts to them. *See Zhao*, 2022 WL 176077, at *3–4 (applying legal standard from *PHC-Minden* when plaintiff asserts that natural person

21

is LLC's sole owner and officer); *Wormald v. Villarina*, 543 S.W.3d 315, 322 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (applying legal standard from *PHC-Minden* when plaintiff asserts that natural person is an alter ego of a corporate entity the natural person owns); *see also PHC-Minden*, 235 S.W.3d at 173–75. The rationale for exercising personal jurisdiction under this theory is that the Halberstams exerted such domination and control over Ozrow that the Halberstams and Ozrow "[did] not in reality constitute separate and distinct legal persons but [were] one and the same legal person for personal-jurisdiction purposes." *Zhao*, 2022 WL 176077, at *3 (citing *PHC-Minden*, 235 S.W.3d at 173). Because "personal jurisdiction involves due-process considerations that may not be overridden by statutes or the common law," the legal standard for piercing the corporate veil between the entity and its owners for personal-jurisdiction purposes differs from the legal standard for piercing the corporate veil between the entity and its owners for liability purposes. *PHC-Minden*, 235 S.W.3d at 174. Accordingly, fraud—a finding of which would be vital to piercing the corporate veil under Section 21.223 of the Business Organizations Code—has no place in determining whether the Halberstams and Ozrow are alter egos for personal-jurisdiction purposes. *See* Tex. Bus. Orgs. Code Ann. § 21.223; *PHC-Minden*, 235 S.W.3d at 175.

To "fuse" the Halberstams and Ozrow for personal-jurisdiction purposes, the Cimianos had to prove that the Halberstams controlled Ozrow's internal business operations and affairs to a degree greater than that normally associated with

22

ownership of an LLC, and the evidence must show that the Halberstams and Ozrow ceased to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice. *See Zhao*, 2022 WL 176077, at *4 (citing *PHC-Minden*, 235 S.W.3d at 175). To determine whether an alter-ego relationship exists for jurisdictional purposes, we must look to the total dealings of the corporation and the individual, including the degree to which corporate and individual property have been kept separate; the amount of financial interest, ownership, and control the individual maintains over the corporation; and whether the corporation has been used for personal purposes. *Wilmington Tr., Nat'l Ass'n v. Hsin-Chi-Su*, 573 S.W.3d 845, 855 (Tex. App.—Houston [14th Dist.] 2018, no pet.). We also consider the following as evidence of alter-ego status: payment of alleged corporate debt with personal checks or other commingling of funds, representations that the individual will back the corporation financially, the diversion of corporate profits for personal use, inadequate capitalization, and other failure to keep corporate and personal assets separate. *Ball Up, LLC v. Strategic Partners Corp.*, Nos. 02-17-00197-CV, 02-17-00198-CV, 2018 WL 3673044, at *15 (Tex. App.—Fort Worth Aug. 2, 2018, no pet.) (mem. op.).

Here, the Cimianos failed to meet their burden of proving that the Halberstams were Ozrow's alter ego. The only evidence the Cimianos offered related to the above-listed factors was a 2018 Texas Franchise Tax Public Information Report that listed both Halberstams as members of Ozrow, Michael's affidavit in which he stated that he was a member of Ozrow and took actions on its behalf, and Ozrow's termination

23

certificate signed by Michael and listing him as Ozrow's only "governing person." This, without more, does not establish alter ego for jurisdictional purposes. *See Zhao*, 2022 WL 176077, at *4 ("[U]nder Texas law, common ownership, directorship, or officers, is insufficient, without more, to establish alter ego for jurisdictional purposes." (citing *PHC-Minden*, 235 S.W.3d at 175)); *N. Frac Proppants, II, LLC v. 2011 NF Holdings, LLC*, No. 05-16-00319-CV, 2017 WL 3275896, at *6 (Tex. App.—Dallas July 27, 2017, no pet.) (mem. op.) ("Alter ego cannot be based on mere stock ownership, duplication of some or all directors or officers, or exercise of the control that stock ownership gives to stockholders."), *overruled on other grounds by Steward Health Care Sys. LLC v. Saidara*, 633 S.W.3d 120, 126–29, 127 n.8 (Tex. App.—Dallas 2021, no pet.).

We thus conclude that that evidence sufficed to support the trial court's implied finding that the Halberstams were not Ozrow's alter ego. As a result, Ozrow's contacts with Texas could not be imputed to the Halberstams under an alter-ego theory.

**D. Specific jurisdiction**

Specific jurisdiction must be established on a claim-by-claim basis. *Moncrief Oil*, 414 S.W.3d at 150–51. Here, the sole claim pleaded by the Cimianos was fraudulent transfer.[4] They alleged that any funds that Ozrow transferred to the Halberstams or to

---

[4] "Alter ego, or piercing the corporate veil, is not an independent cause of action, but is instead a means of imposing liability for an underlying cause of action."

anyone else "as a result of or in connection with the sale of Amberwood Apartments or [the] winding up" of Ozrow were transferred with the intent to delay, hinder, or defraud the Cimianos, specifically to prevent them from collecting the judgment. *See* Tex. Bus. & Com. Code Ann. § 24.005(a)(1) (providing that a transfer is fraudulent if the debtor made the transfer "with the actual intent to hinder, delay, or defraud any creditor of the debtor"); *Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 726 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (op. on reh'g) (noting that the Uniform Fraudulent Transfer Act "not only creates liability against 'the person for whose benefit the transfer was made,' such as the debtor, but also against 'the first transferee of the asset' or any 'subsequent transferee'" (quoting Tex. Bus. & Com. Code Ann. § 24.009(b))). The Cimianos further alleged that they had suffered at least $105,000—the amount of the judgment—in damages because of the fraudulent transfers.

"For a Texas court to exercise specific jurisdiction over a defendant, the defendant's purposeful contacts must be substantially connected to the operative facts of the litigation or form the basis of the cause of action." *Old Republic*, 549 S.W.3d at 559–60 (first citing *Moki Mac*, 221 S.W.3d at 585; and then citing *Michiana*, 168 S.W.3d at 795). Here, Ozrow—a Texas LLC whose principal office and place of business were in New Jersey—is alleged to have transferred funds to the Halberstams, who are New Jersey residents, with the intent to prevent the Cimianos from collecting a Texas

*Dodd v. Savino*, 426 S.W.3d 275, 291 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (op. on reh'g).

judgment. But there is no allegation or evidence of how or where the transfer of funds to the Halberstams took place. According to the Texas Supreme Court, a nonresident's accepting the transfer of money—even if drawn on a Texas bank—is insufficient to establish purposeful availment. *See id.* at 564 (holding that allegations of alleged fraudulent transfer of a fungible asset—money—is not viewed the same as the fraudulent transfer of Texas-based business operations and real property and concluding that even if nonresident defendant's receipt of funds from the sale of Texas real property was "part of an elaborate fraudulent transfer scheme, her contacts [did] not establish purposeful availment of the state of Texas" because "the mere act of accepting the transfer of money drawn on a Texas bank is 'of negligible significance for purposes of determining whether [a foreign defendant] had sufficient contacts with Texas'" (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416–17, 104 S. Ct. 1868, 1873 (1984))). And finally, "the mere allegation that a nonresident directed a tort from outside the forum against a resident is insufficient to establish personal jurisdiction." *Id.* at 562 (citing *Michiana*, 168 S.W.3d at 790–91); *see TV Azteca*, 490 S.W.3d at 43 (concluding that "the mere fact that [the nonresident defendants] directed defamatory statements at a plaintiff who lives in and allegedly suffered injuries in Texas, without more, does not establish specific jurisdiction over [those defendants]").

The Cimianos also point to Michael's alleged criminal conduct as a basis for asserting specific jurisdiction over him.[5] As noted, the Cimianos pleaded that Michael had

> signed a materially false certificate of termination that was filed with the Texas Secretary of State, which was of course intentionally transmitted into Texas, to terminate Ozrow . . . . Therein, he indicated that Ozrow . . . had "complied with the provisions of the Texas Business Organizations Code governing its winding up" when it had not done so, namely by not notifying [the Cimianos] of the wind-up. [The Halberstams] likely kept the company "open" as a shell company after the sale of Amberwood Apartments without winding it up until they could later do so "under the radar." *Someone*, almost certainly [the Halberstams] obtained some personal financial benefit from this fraud on [the Cimianos].

Michael averred in his affidavit supporting the Halberstams' special appearance that Ozrow had "voluntarily decided to wind up its business in a manner approved by the Texas Business Organizations Code and by the governing documents for Ozrow" and

---

[5]Section 4.008 of the Business Organizations Code imposes criminal penalties for filing materially false filing instruments:

> (a) A person commits an offense if the person signs or directs the filing of a filing instrument that the person knows is materially false with intent that the filing instrument be delivered on behalf of an entity to the secretary of state for filing.

> (b) An offense under this section is a Class A misdemeanor unless the actor's intent is to defraud or harm another, in which event the offense is a state jail felony.

Tex. Bus. Orgs. Code Ann. § 4.008.

that he had "filed or caused to be filed" the certificate of termination with the Texas Secretary of State.

The Cimianos' fraudulent-transfer claim, however, did not arise from or relate to Michael's filing an allegedly materially false certificate of termination with the Texas Secretary of State. It arose from Ozrow's transferring funds to the Halberstams. In other words, Michael's Texas contact—filing a allegedly materially false document with the Texas Secretary of State—is not substantially connected with the operative facts of this litigation such that the Cimianos' fraudulent-transfer claim arose from that contact. *See Old Republic*, 549 S.W.3d at 563. Consequently, Michael's filing the termination certificate is insufficient to support specific jurisdiction over him. *See id.* at 560 ("[T]o support an exercise of specific jurisdiction, there must be a substantial connection between [the nonresident defendant's] contacts and the operative facts of the litigation."); *Moki Mac*, 221 S.W.3d at 585 (stating that "for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation").

We thus conclude that the Halberstams' alleged Texas contacts were insufficient to support specific jurisdiction over them in Texas.

### E. General jurisdiction

The Cimianos also assert that the Halberstams are subject to general jurisdiction here. Regarding general jurisdiction, the Cimianos specifically pleaded,

28

"Based on a long history of having interests in entities doing business in Texas, it also seems reasonably likely that there may be some basis for general jurisdiction based on systemic and continuous contacts that could be shown after discovery."

As noted, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Daimler AG*, 571 U.S. at 137, 134 S. Ct. at 760 (quoting *Goodyear Dunlop Tires Operations*, 564 U.S. at 924, 131 S. Ct. at 2853). The Cimianos did not allege that the Halberstams are domiciled in Texas, and they admit that the Halberstams are New Jersey residents. The Halberstams averred in their affidavits that they were New Jersey residents, were domiciled there, and had never been Texas residents. Chaya had never been to Texas, and Michael had not been to Texas "[f]rom the time Ozrow purchased the Amberwood Apartments in 2014 through the time Ozrow legally wound up its business in 2019." The Halberstams' only alleged contacts with Texas were on behalf of or through their ownership of Ozrow.

As the Halberstams pointed out in their special appearance, their "affiliations with Texas, if any, do not render them 'at home' in Texas. . . . The Halberstams, as individuals, are considered 'at home' [where] they are domiciled," which is New Jersey, not Texas. *See id.* at 137, 134 S. Ct. at 760; *see also Domicile*, Black's Law Dictionary (11th ed. 2019) (defining "domicile" as "[t]he place at which a person has been physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere" and "[t]he residence of a person . . . for

legal purposes"). Because the Cimianos' allegations regarding the Halberstams' Texas contacts do not suffice to establish that they are "essentially at home" in Texas, those allegations do not support general jurisdiction.

## F. Conclusion

Because the Halberstams lack the requisite minimum contacts with Texas to be subject to personal jurisdiction here, we overrule the Cimianos' third and fourth issues.

## V. Conclusion

Having overruled all four of the Cimianos' issues, we affirm the trial court's order granting the Halberstams' special appearance.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: June 13, 2024